AMERICAN GENERAL FINANCE MANAGEMENT CORPORATION, Appellant,

v.

Robert Stephen WATSON, American General Enterprise Services, and American General Corporation, Appellees.

No. 82A01–0406–CV–248.

Court of Appeals of Indiana.

Feb. 14, 2005.

Jody A. Ballmer, Dorothy L. Young, Littler Mendelson, P.C., Chicago, Illinois, Jon Goldman, Kahn, Dees, Donovan & Kahn, LLP, Evansville, IN, Attorneys for Appellant.

Steve Barber, Jeff Shoulders, Barber & Shoulders, LLP, Evansville, IN, Attorneys for Appellee Robert Stephen Watson.

## OPINION

SULLIVAN, Judge.

American General Finance Management Corporation ("AGF") appeals from the trial court's denial of its motion to compel arbitration. It presents one issue for our review, which we restate as whether AGF and Robert Watson agreed to arbitrate employment disputes according to the pro-

visions of the Federal Arbitration Act ("FAA").

We reverse and remand.

Watson began employment with Credi-Thrift on September 18, 1978. CrediThrift was later acquired by American General Corporation ("AGC"). With the exception of a period of time from October 18, 1986 until July 29, 1988, Watson remained an employee within the AGC family[1] until he was fired on March 29, 2002. During that period of time, he was employed by AGF until August 4, 1995, at which time he resigned his position to work for American General Enterprise Services ("AGES"), also a subsidiary of AGC. In late December 2001 or early January 2002, Watson was officially transferred from AGES back to AGF. As part of the move, Watson had to relocate from New York to Evansville.

Watson's employment with AGF following his transfer to Evansville involved government relations, acquiring a company in Great Britain, and liquidating Residential Mortgage Services of Texas ("RMST"). In relation to his duty to liquidate RMST, Watson obtained daily management reports concerning the assets and liabilities of RMST. Watson believed that RMST was reporting certain loans as assets after those loans had been sold at a discount, resulting in a loss which was not being reported. Watson complained to the financial department and the risk management department that the reports were inaccurate and the practice was illegal. Following his return to Evansville from Texas, Watson was informed that his employment was being terminated.

Watson filed a complaint against AGF, AGES, and AGC (collectively "the Defendants") in which he alleged in Count I that he was wrongfully terminated. He further alleged in Counts II and III that the De-fendants breached an employment contract with him by failing to pay him a $50,000 bonus he earned while at AGES, which AGF had agreed to pay to him, and that the failure to pay the bonus was a violation of the Indiana Wage Claims statute, Indiana Code 22–2–9 (Burns Code Ed. Repl.1997).

AGF challenged the filing of the complaint by filing a motion to compel arbitration which it asserts is mandated by the Employment Application which Watson completed and signed upon his transfer to AGF. The Employment Application included the following dispute resolution clause:

> "An Employee Dispute Resolution Plan is in place at American General. I understand and agree that I will be subject to the Plan. The Plan requires resolution of any applicant or employee dispute covered by the Plan through informal and formal means, including binding arbitration, if necessary. This Plan is the exclusive means for resolving employment disputes, including claims by applicants, except as otherwise provided by law. Under the Plan, employees do not have the right to file a lawsuit in state or federal court, but employees do have the right to file charges with the EEOC and similar state/local agencies in addition to mediation and arbitration. The details of the Plan, including any limitations or exclusions, are furnished to each employee upon hire and can be obtained by applicants upon written request." Appendix at 81.

The question before us is whether this clause controls the dispute in this case.

 The FAA applies to written arbitration provisions contained in contracts involving interstate commerce when the parties agree to arbitrate. *MPACT*

---

1. AGF is a subsidiary of AGC.

*Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 904 (Ind.2004). The United States Supreme Court has stated that both state law contract principles and federal substantive law of arbitration apply when determining whether the parties agreed to arbitration. *Id.* (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) and *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).[2] According to the United States Supreme Court, state laws generally applied to contracts may be applied to arbitration agreements, but courts may not invalidate arbitration agreements under state laws which are applicable only to arbitration agreements. *Id.*

■ " 'The FAA contains no express preemptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration.' " *Id.* at 905 (quoting *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 477, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). Nonetheless, state law may be preempted to the extent that it actually conflicts with federal law. *Id.* In other words, it may be preempted where it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.* In cases where state statutes explicitly made certain arbitration clauses unenforceable or placed serious burdens on the enforceability of arbitration provisions, preemption has been found. *Id.* However, federal law does not preempt if the trial court, fairly applying generally applicable state contract law principles and not singling out arbitration agreements for hostile treat-

ment, finds that the parties did not agree to arbitrate. *Id.* at 906.

■ The determination of whether the parties agreed to arbitrate any disputes is based upon contract interpretation and is a matter of the parties' intent. *Id.* Parties are free to enter into contracts and courts have presumed that contracts represent the freely bargained agreement of the parties. *Id.* Courts regularly distinguish the treatment given questions of the existence of an agreement to arbitrate and questions of the scope of an agreed-to arbitration clause. *Id.*

■ Interpretation of a written contract is generally a question of law. *Underwriting Members of Lloyds of London v. United Home Life Ins., Co.,* 549 N.E.2d 67, 69 (Ind.Ct.App.1990), *adopted by* 563 N.E.2d 609 (Ind.1990). If no defect is claimed to have occurred during the formation of a contract, its terms, if unambiguous, are conclusive on the question of the intentions of the parties. *Id.* In determining whether a contract's terms are ambiguous, words must be given their usual and plain meaning unless it is determined from the entire contract that some other meaning was intended. *Id.* Words, phrases, sentences, and paragraphs cannot be read alone. *Id.* Instead, the intention of the parties must be gleaned from the entire contract. *Id.*

[9] While it does not appear that it was argued before the trial court, the court stated that the contract created doubt as to the true intent of the parties. Consequently, the court denied the motion to arbitrate. The trial court's concern about the intent of the parties was created by Watson's inclusion of a handwritten note in

2. Since the time of the Supreme Court's decision in *Moses H. Cone Mem'l Hosp.,* the FAA has been amended to include a section which lists when rulings upon matters related to arbitration may be appealed. That change does not affect the premise underlying *Moses H. Cone Mem'l Hosp.* upon which we rely.

the margins of the Employment Application. That note was written on the same page which contained the above quoted clause regarding the resolution of employment disputes. It stated, "I am transferring to American General Finance from within the American General Financial Group and my seniority and other benefits remain unaffected." App. at 81.

Upon appeal, Watson asserts that a question exists as to whether the parties agreed to the terms of the Employment Application. He further asserts that the trial court properly determined that more information was needed before it could determine whether the parties had agreed to arbitrate any disputes with regard to Watson's claim that he was owed payment for the $50,000 bonus.[3] From reviewing the Employment Application, it is obvious that the handwritten notation was nothing more than Watson's attempt to secure his seniority and benefits and did not affect the dispute resolution clause. In fact, we would stretch contract interpretation beyond its limits to even suggest that Watson refused the dispute resolution clause through the notation. Consequently, we conclude that the parties agreed that any disputes which arose between Watson and AGF would be resolved through the process discussed in the dispute resolution clause contained in the Employment Application.[4]

▮▮▮ Watson also asserts that the dispute resolution agreement applies only to disputes which arose after his employment with AGF. Thus, the agreement cannot be relied upon by AGF to compel him to arbitrate a dispute which relates to a matter which preceded the agreement. This argument fails for the simple fact that the dispute about whether AGF failed to pay or blocked payment to Watson of the bonus did not arise until after Watson became employed by AGF. That he may have earned the bonus prior to his employment with AGF does not alter the agreement to settle any disputes with means other than litigation in a court of law.

We now turn our attention to whether the FAA compels arbitration in this case. In drafting the FAA, Congress stated:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1999).

Section 1 of Title 9, which is considered an "exception" to § 2, states in relevant part: "but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."

▮▮▮ There is no dispute that the facts of this case place it within the realm of the FAA. Rather, the concern is how far the

---

**3.** Because the issue is not before us, we do not address the validity of Watson's claim that he was entitled to a bonus of $50,000.

**4.** Watson's position that it is not clear that the parties agreed to the dispute resolution process is peculiar in light of his response to AGF's motion to compel arbitration. In his response, he admitted that he agreed to AGF's dispute resolution process and challenged the use of arbitration to resolve his claim against AGF solely on Counts II and III. Given these facts, the trial court should have, at a minimum, granted AGF's motion to compel arbitration as to Count I.

FAA goes in requiring arbitration between AGF and Watson. In other words, does the FAA compel the arbitration of the claims against AGF with respect to the failure to pay him the bonus he alleges he was due. In reaching its conclusion to deny the request for arbitration, the trial court concluded that the facts before us fell within the reach of Indiana Code § 34–57–2–3 (Burns Code Ed. Repl.1998). Subsection (f) of that statute states, "If the court determines that there are other issues *between the parties* that are not subject to arbitration and that are the subject of a pending action or special proceeding between the parties and that a determination of such issues is likely to make the arbitration unnecessary, *the court may delay its order to arbitrate* until the determination of such other issues or until such earlier time as the court specifies."[5] (emphasis supplied).

The trial court concluded that this subsection applied because "the three defendants are so intertwined that common sense dictates they should be litigated together." App. at 11. By applying the statute, the trial court justified denying AGF's right to compel arbitration under the FAA as agreed to in the Employment Application. Effectively, the trial court concluded that the Indiana statutory provision takes precedence over the FAA.[6] Such a reading of the statute would appear to violate the premise that a state law will be preempted when it actually conflicts with federal law and stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See MPACT Constr. Group,* 802 N.E.2d at 905, *supra.*

[12] Moreover, our reading of I.C. § 34–57–2–3(f) leads us to conclude that it does not apply under the facts of this case. The statute applies to situations in which the same parties to the arbitration agreement also have a pending action between them which is not subject to arbitration. As we have noted, that is not the case here. Rather, AGF and Watson had an agreement to arbitrate all issues between them, including whether AGF owed Watson payment for a $50,000 bonus he may have previously earned. Furthermore, AGES and AGC were not parties to the dispute resolution agreement.[7] Therefore, the Indiana Uniform Arbitration Act does not apply to the claims against them.[8]

---

5. In *Underwriting Members of Lloyds of London,* 549 N.E.2d at 70, *supra,* this court discussed the "permeation doctrine" and noted that this provision codified that doctrine. The permeation doctrine has its roots in the federal courts and was articulated by the 7th Circuit Court of Appeals as follows: "[T]he permeation doctrine, whereby a district court may stay an action to compel arbitration if nonarbitrable issues are so inseparable from the subject matter of the arbitration that the arbitrators would find it difficult to do their job without making findings that would have collateral estoppel effect in the trial of the nonarbitrable issues." *University Life Ins. Co. of America v. Unimarc Ltd.,* 699 F.2d 846, 850 (7th Cir.1983).

6. In its ruling the trial court articulated a policy consideration with regard to corporate misdeeds and whistle-blowing and that such "issues must be resolved quickly." App. at 11. In the trial court's view that result could best be achieved by proceeding with the civil litigation upon Watson's complaint.

7. No issue is presented which might bring into play the doctrine of piercing the corporate veil as between and among AGF, AGC, and AGES.

8. In his brief, Watson stated that the trial court delayed arbitration until it could gather more information to determine whether the parties intended to arbitrate any issues relating to the bonus. While the trial court may have been attempting to delay any ruling upon the motion to compel arbitration, which would partially explain the reliance upon I.C. § 34–57–2–3(f), the order clearly denied the motion to compel arbitration and was written

Consequently, the trial court's conclusion that I.C. § 34–57–2–3(f) applied in this case was erroneous, and accordingly, arbitration as authorized by the FAA is compelled.

One final issue must be resolved in order for the effective and fair resolution of the claims before us. AGF presents the question of whether the permeation doctrine applies in this case but argues against its application here because there are no nonarbitrable issues between AGF and Watson. We tend to agree with this proposition. However, we cannot ignore the fact that the arbitrable issue of whether AGF is liable to Watson for failure to pay the $50,000 bonus is premised upon a nonarbitrable issue relating to a separate defendant. There is no doubt that a trial court or jury must decide whether Watson is owed $50,000 as a bonus he earned from AGES before the issue can be arbitrated between him and AGF. Consequently, this fact would indicate that arbitration must be delayed until after Counts II and III are resolved with respect to AGES and AGC. Because the parties have not provided us with any law which would preclude this practice and no viable alternative appears to exist, we are left with no choice but to order that the arbitration be delayed until a determination by a fact-finder of whether AGES owed a bonus to Watson and whether that money has been paid to any party.

We reverse the trial court's order denying the motion to compel arbitration. Because the wrongful termination action could be arbitrated at this time, the trial court may order the parties to go to arbitration upon that issue. However, because the issue of failure to pay the bonus may

in such manner that it appears that the trial court intended the entire action to proceed to

not be settled without determining AGES's liability first, arbitration on that issue is delayed until after the resolution of the issue with respect to AGES and AGC on Counts II and III.

NAJAM, J., and BARNES, J., concur.

trial almost immediately.